*In re* SNOW'S ESTATE.

WELLS *v.* MICHIGAN TRUST COMPANY.

1. ESTATES OF DECEDENTS—PERSONAL SERVICES—WEEKLY COMPENSATION—QUESTION FOR JURY. -
   Where deceased, a widower afflicted with shaking palsy, was taken care of by plaintiff, his brother-in-law, and wife, and evidence establishes that plaintiff's services were not to be

gratuitous, fact that there was some uncertainty as to just whether the stipulated weekly compensation was to, pay for services of plaintiff or of both he and his wife presented a question of fact for the jury.

2. Trial—Motion to Direct Verdict—Request to Charge.

When, in addition to motion to direct a verdict, a party presents requests to charge the jury, it negatives his intent to waive the right to have the jury pass upon the case; and if his motion to direct is denied, he is entitled to go to the jury on any proper issue of fact.

3. Same—Motion to Direct Verdict—Damages—Question for Jury.

Fact that after plaintiff's motion for directed verdict, except as to amount, was denied with decision reserved under Empson act, defendant moved for a directed verdict in its favor, did not constitute the court the sole trier of all facts preliminary to determination of amount since the plaintiff still sought determination by jury (3 Comp. Laws 1929, § 14531 et seq., as amended by Act No. 44, Pub. Acts 1939).

4. Interest—Unliquidated Amount.

Interest does not run on an unsettled or unliquidated account unless there is an express or clearly implied agreement that it shall do so.

5. Appeal and Error—Claims Against Estates—Personal Services—Verdict—Evidence.

Jury's determination as to question of fact as to amount of plaintiff's claim against brother-in-law's estate for personal services rendered deceased, who had been afflicted with shaking palsy, held, not against the weight of the evidence, hence it was error to enter judgment for defendant non obstante veredicto, as to valid portion of verdict.

6. Same—Verdicts—Interest—Weight of Evidence.

Where jury's verdict, except for wrongfully included interest, was not against the weight of the evidence, but judgment was entered for defendant non obstante veredicto, case is remanded for entry of judgment on proper verdict.

7. Costs—Each Party Prevailing Only in Part.

No costs are allowed in case wherein each party has prevailed on appeal only in part.

Appeal from Kent; Verdier (Leonard D.), J. Submitted October 9, 1947. (Docket No. 34, Calendar No. 43,810.) Decided December 3, 1947. Rehearing denied January 5, 1948.

In the matter of the estate of Elbert H. Snow, deceased. Alvin Wells filed claim for services rendered deceased. On trial in circuit court verdict was for plaintiff. Judgment for defendant *non obstante veredicto*. Plaintiff appeals. Michigan Trust Company, administrator, cross-appeals. Reversed and remanded for entry of judgment on verdict.

*Fred P. Geib* and *Clem H. Block,* for plaintiff.

*Laurence W. Smith,* for administrator.

REID, J. Plaintiff Alvin Wells filed his claim against the estate of his deceased brother-in-law, Elbert H. Snow, for services, conveniences and accommodations rendered to deceased by claimant and for inconveniences caused to claimant, by the presence of deceased in claimant's home for two years and three months prior to his death, over and above nursing services furnished by claimant's wife during the same period. The case was tried before a jury. Plaintiff's claim was for $2,530, and the jury rendered a verdict in his favor for $2,706.38, which evidently included interest from the date of Snow's decease to the date of the verdict. The court granted a motion to set aside the verdict and rendered a judgment of no cause of action in favor of the estate notwithstanding the verdict. Plaintiff appeals. Defendant in a cross-appeal asks that in the event of a reversal of the judgment that a new trial be granted.

The deceased, who had been a traveling salesman for a hardware company, had become afflicted with shaking palsy, otherwise known as paralysis agitans, or Parkinson's disease. For some years thereafter he had continued in his employment, the company furnishing him an automobile so that he might continue in the matters of his employment. About 1940 he was compelled to give up his work but received

a pension of $150 per month, which continued until his death. He became progressively worse until he was entirely helpless. His wife cared for him until her death, December 31, 1942, and his relatives then conferred with him about possible arrangements for his future care. Before finally deciding to come to plaintiff's residence, Snow considered several other possible arrangements for his care, none of which proved feasible. One proposition was that his niece by marriage, Mrs. Bartholic, and her husband, should come from their home in Hot Springs, Arkansas, and take care of him in his Grand Rapids residence, but the Bartholics refused. Mrs. Bartholic, after mentioning some changes that had to be made at Wells' residence to accommodate Mr. Snow, testified:

"It was after he decided to go to the home of Mr. and Mrs. Wells and he discussed the fact that if he went out there and made his home there, there should be some provision made for Mr. and Mrs. Wells to compensate them for taking care of him."

Mrs. Wells testified:

"He was very upset over the idea that the Bartholics couldn't come here, and because of his physical condition he was at a loss to know what could be done for him    *    *    *    and then he wanted to know about could we come and live with him?    *    *    *    I told Mr. Snow if he came to our home it would be a great deal more than if we went to his home because he had promised to pay all expenses.    *    *    *    I told Mr. Snow he could come and live with us but not on the same terms we would go to his house because it would be more expense to us to have him in our home than going in his home.    *    *    *    He said to me (') as long as I was going to give the home to Mrs. Bartholic for coming here it seems that those taking care of me should be entitled to as much.(')

\* \* \* I told Mr. Snow what our conclusion was. We wrote him a letter, we told him—Mrs. Bartholic was there and read it to him and answered it. \* \* \* There wasn't anything else for him to do except to accept our proposition. That was early in February. \* \* \* There was talk between me and Mr. Snow about $10 a week. He said, if we came to Grand Rapids to live,—he would pay—with him—he would pay fuel bills, gas, telephone and up-keep of the house, and he would pay half of the grocery bill, but as long as I don't come in he would pay, contribute toward the upkeep of the house,—grocery bill, or whatever we might use it for. After he came to our home he did pay that amount to me every week. It was used mostly for groceries."

Mrs. Wells further testified:.

"*Q.* That is the arrangement, and agreed upon $10 a week. There was that much about it?

"*A.* Yes, sir; and he said he would give us the home. \* \* \* We told Mr. Snow we didn't feel we could come to town. He said, 'Well, you know I haven't laid up a great deal, and I don't know what is going to become of me, but whoever takes care of me from now on will benefit by what is left after I am through with it.' \* \* \* We told him if he couldn't find anyone to live with, we would take him in as a last resort at our home."

At that time and until his death deceased was entirely helpless, could not control the motion of his hands and feet, and had to be carried or lifted to the bathroom. Mrs. Wells testified regarding deceased's condition:

"He had to turn in bed and also when you bathed him in the morning he had to be bathed in oil to keep him from getting bed sores, and used cellulose cotton to keep him from the sheets and it took two to get him from the side of the bed and to change the bed and to change the pajamas and take care of him gen-

erally. * * * He had to wear a urinal for months. * * * And Mr. Wells would take it and keep it clean, clean it up and replace it; and when his hemorrhoids come down he would replace them, and just give every care necessary just as well as I could.''

In order to accommodate the deceased, plaintiff gave up the bedroom he and his wife had been occupying, put in a bathroom and inside toilet, and reduced the number of cows on his 80-acre farm so he could give more of his time to caring for deceased.

There is a sufficient showing in the testimony to establish as a fact that the care and attention given deceased by the claimant, plaintiff Wells, was not in any degree to be gratuitous. It can be fairly inferred from the testimony regarding conversations between the parties that deceased Snow expected to pay and Mr. and Mrs. Wells expected to receive, if not the equivalent in value of the residence of Snow in Grand Rapids (sold for $6,300), at least fair compensation for the services each rendered over and above reimbursement for the actual cash outlay made necessary from week to week by Mr. Snow's stay in the Wells' residence.

The jury were instructed, if they found for plaintiff, to award for his separate services only.

The estate does not claim that the payment of $10 a week could well be considered adequate compensation but claims that the payment was made in carrying out an agreement and that the $10 a week was to cover the entire pay that either Mr. or Mrs. Wells or both should receive.

The trial judge in his opinion on motion for a judgment *non obstante veredicto* among other things found:

"As to just what the $10 was to pay for is left in a state of uncertainty by the testimony."

A careful reading of the record convinces us of the accuracy and correctness of that statement. It was therefore a question of fact and the jury's verdict in the determination of that fact should have been left to stand and not be set aside.

Plaintiff requested the court to charge the jury that as a matter of law plaintiff was entitled to recover and that the jury's only duty was to determine the amount, which request was denied with decision reserved under the Empson act.* Defendant moved for verdict directed in defendant's favor. Defendant claims that under such circumstances the court became the sole trier of all facts which are preliminary to determination of the amount, under the authority of *Culligan* v. *Alpern,* 160 Mich. 241. As neither of the attorneys in the *Culligan Case* wanted the case submitted to the jury (see p. 247), the action of the court in disposing of that case was found not erroneous.

We further note the following from syllabus 2 in *Re Frazee's Estate (Dornbos* v. *Hall),* 307 Mich. 404:

"When, in addition to motion to direct a verdict, a party presents requests to charge the jury, it negatives his intent to waive the right to have the jury pass upon the case; and if his motion to direct is denied, he is entitled to go to the jury on any proper issue of fact."

In the case at bar plaintiff was entitled to go to the jury.

The claim filed was for $2,530 and included no interest. Interest was not allowable.

---

* 3 Comp. Laws 1929, § 14531 *et seq.,* as amended by Act No. 44, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 14531, Stat. Ann. and Stat. Ann. 1946 Cum. Supp. § 27.1461 *et seq.*).—REPORTER.

"Interest does not run on an unsettled or unliquidated account unless there is an express or clearly implied agreement that it shall do so." from syllabus in *Sweeney* v. *Neely,* 53 Mich. 421.

"In the absence of agreement and except by way of damages for money withheld, interest does not run on an unliquidated claim." *Township of Royal Oak* v. *City of Berkley,* 309 Mich. 572, 584.

In the case at bar there was sufficient evidence to sustain the verdict and we do not find that the verdict, except for the amount of interest, is against the weight of the evidence.

The judgment for the estate is set aside. The case is remanded to the lower court with instruction to enter a judgment for plaintiff on the verdict for $2,530, which is the amount of the verdict less the wrongfully included interest. Each party having prevailed in part, no costs are allowed.

CARR, C. J., and BUTZEL, BUSHNELL, SHARPE, BOYLES, NORTH, and DETHMERS, JJ., concurred.